**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: Application of IKB DEUTSCHE | ) | |
| INDUSTRIEBANK AG for an Order to | ) | |
| Conduct Discovery for Use in a Foreign | ) | No. 09-7852 |
| Legal Proceeding Pursuant to 28 U.S.C. | ) | |
| § 1782 | ) | Honorable John W. Darrah |

**MAGNETAR CAPITAL LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO VACATE THE GRANT OF IKB DEUTSCHE INDUSTRIEBANK AG'S
<u>EX PARTE 28 U.S.C. § 1782 APPLICATION AND TO QUASH IKB'S SUBPOENA</u>**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  BACKGROUND .....................................................................................................2

    A.  The Foreign Litigation ...........................................................................2

    B.  IKB's Subpoena ......................................................................................2

    C.  Timing of IKB's Ex Parte Application ..................................................7

III.  ARGUMENT ..........................................................................................................8

    A.  The Court Should Exercise Its Discretion and Vacate the Order Granting IKB's Application Because IKB's Request Is Unduly Intrusive and Burdensome and Because It Is Nothing More Than an End-Run Around English Discovery Rules .........................................................................8

        1.  The Subpoena Places an Undue and Intrusive Burden on Magnetar ...........9

            a.  IKB Cannot Justify Its Pursuit of Discovery From Magnetar Because the Information Sought Is Not Relevant to the Underlying U.K. Litigation ....................................11

            b.  The Requested Documents and Rule 30(b)(6) Testimony Can Be Obtained From Calyon and Are Not Needed from Magnetar .........................................................................12

            c.  IKB's Discovery Requests Are Incredibly Overbroad and Place an Undue Burden on Magnetar, a Non-Party ......................13

            d.  The Time Period Covered By the Subpoena Also Places an Undue Burden on Magnetar, a Non-Party .....................................15

         2.  The Court Should Also Vacate the Ex Parte § 1782 Order Because It Is an End-Run Around English Discovery Rules ...................................16

    B.  The Court Should Quash IKB's Subpoena Because It Subjects Magnetar, a Non-Party, to Undue Burden ....................................................................17

    C.  The Court Should Impose an Appropriate Sanction on IKB for Imposing an Undue Burden on Magnetar ................................................................18

IV.  CONCLUSION ......................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bond v. Utreras,*
No. 04 C 2617, 2006 WL 1806387 (N.D. Ill. June 27, 2006) .................................................10

*CareToLive v. Von Eschenbach,*
No. 2:07-cv-729, 2008 WL 552431 (S.D. Ohio Feb. 26, 2008) .............................................18

*Guy Chemical Co., Inc. v. Romaco AG,*
243 F.R.D. 310 (N.D. Ind. 2007) .........................................................................................14

*Haworth Inc. v. Herman Miller, Inc.,*
998 F.2d 975 (Fed. Cir. 1993).................................................................................................13

*Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.,*
333 F.3d 38 (1st Cir. 2003)......................................................................................................12

*In re Apotex Inc.,*
No. M12-160, 2009 WL 618243 (S.D.N.Y. Mar. 9, 2009) ....................................................10

*In re Cusumano v. Microsoft Corp.,*
162 F.3d 708 (1st Cir. 1998)....................................................................................................12

*In re Heraeus Kulzer,*
No. 3:09-MC-08 CAN, 2009 WL 961229 (N.D. Ind. Apr. 8, 2009) ............................9, 16, 17

*Intel Corp. v. Advanced Micro Devices, Inc.,*
542 U.S. 241 (2004)...............................................................................................................8, 9

*Kestrel Coal Pty. Ltd. V Joy Global Inc.,*
362 F.3d 401 (7th Cir. 2004) ...............................................................................................8, 17

*Molefi v. Oppenheimer Trust,*
No. 03 CV 5631, 2007 WL 538547 (E.D.N.Y. Feb. 15, 2007) .............................................18

*Northwestern Mem'l Hosp. v. Ashcroft,*
362 F.3d 923 (7th Cir. 2004) ..................................................................................................10

*Patterson v. Burge,*
No. 03 C 4433, 2005 WL 43240 (N.D. Ill. Jan. 6, 2005) ......................................................11

*Theofel v. Farley-Jones,*
359 F.3d 1066 (9th Cir. 2004), *cert. denied* 543 U.S. 813 ...................................................19

*United States v. Amerigroup Ill., Inc.*,
   No 02 C 6074, 2005 WL 3111972 (N.D. Ill. Oct. 21, 2005) ......................................10, 12, 17

*Waddell v. Greyhound Lines, Inc.*,
   Civil No. 08-2014-Ma/P, 2008 WL 4982633 (W.D. Tenn. Nov. 19, 2008)...........................11

*Xcaliber Intern. Ltd., L.L.C. v. Ieyoub*,
   No. 04-0069, 2006 WL 3412265 (E.D. La. Nov. 27, 2006) ....................................................13

## STATUTES

28 U.S.C. § 1782 ........................................................................................................... passim

28 U.S.C. § 1782(a) ...........................................................................................................8, 9

## OTHER AUTHORITIES

Civil Procedure Rule 31.17 ...................................................................................................16

Civil Rule 45(c)(1) ................................................................................................................18

Fed. R. Civ. P. 26(b)(2) .........................................................................................................13

Fed. R. Civ. P. 45(c)(1) .........................................................................................................18

Federal Rule of Civil Procedure 45(c)(3)(A)(iv) ............................................................1, 15, 17

Rule 30(b)(6) .................................................................................................................2, 3, 12, 13

Rule 45 ....................................................................................................................................17

Rule 45(c) ...............................................................................................................................11

Rule 45's ................................................................................................................................18

## I.      INTRODUCTION

On the heels of filing its responsive pleading in litigation pending in a foreign court, and instead of seeking discovery from its party opponent and through that court's discovery processes and rules, IKB Deutsche Industriebank AG ("IKB") raced into this Court with an ex parte application for the purpose of seeking incredibly broad and cumulative discovery from a third-party—Magnetar Capital LLC ("Magnetar")—that has absolutely nothing to do with the events that led to the foreign litigation.  Magnetar is now requesting that this Court exercise its wide discretion and vacate the December 22, 2009, order granting IKB's ex parte 28 U.S.C. § 1782 application for discovery for use in a foreign proceeding.  Pursuant to Federal Rule of Civil Procedure 45(c)(3)(A)(iv), this Court should also quash IKB's unduly burdensome and extremely premature third-party subpoena.

Magnetar respectfully requests that this Court vacate its order granting IKB's ex parte § 1782 application because (1) IKB's subpoena is unduly burdensome and intrusive, and (2) is an obvious attempt to circumvent English disclosure procedures.  The subpoena makes sweeping demands for documents completely unrelated to the financial transaction that gave rise to the foreign litigation.  It also includes the most expansive set of Definitions and Instructions imaginable.  (*See* Subpoena at 3-4, attached as Ex. A).  Additionally, many, if not all, of the documents IKB seeks from Magnetar can be obtained directly from Calyon, the plaintiff in the foreign court.  Furthermore, the timing of IKB's ex parte application and subpoena demonstrates a blatant attempt to circumvent English discovery rules.  For the same reason that the Court should vacate the § 1782 order, the Court should quash IKB's subpoena and should order IKB to pay Magnetar's reasonable costs and fees in responding to the subpoena, including the preparation of this Motion.

## II.     BACKGROUND

### A.     The Foreign Litigation

The foreign litigation which led to IKB's ex parte discovery application is *Calyon v. IKB Deutsche Industriebank Aktiengesellschaft*, 2009 Folio Nos. 926, 1031, pending in the High Court of Justice, Queen's Bench Division, Commercial Court, United Kingdom (the "U.K. Litigation").  This litigation arises out of the participation of Calyon—a French bank—and IKB—a German bank—in a sophisticated financial transaction known as "Havenrock II." (Calyon's Particulars of Claim, attached as Ex. C to IKB's § 1782 application).

Calyon claims in its lawsuit that it incurred damages when it honored contractual commitments arising under a Put Option Agreement that IKB fraudulently induced Calyon to execute in connection with Havenrock II.  Calyon alleges causes of action for breach of contract and the torts of deceit and negligent misrepresentation in connection with the breach.  Calyon contends that, among other things, (i) Calyon was fraudulently induced to participate in the Havenrock II transaction based on misrepresentations about IKB's financial statements, (ii) IKB failed to negotiate the Havenrock II transaction in good faith, and (iii) IKB failed to inform Calyon of deficient risk management and reporting structures as to the portfolio of investments associated with the "Rhineland Programme," a program IKB launched in 2002 to facilitate investments in structured investment products.  Magnetar had absolutely nothing to do with the Havenrock II transaction, the "Rhineland Programme," or the dealings between Calyon and IKB.

### B.     IKB's Subpoena

On December 23, 2009, IKB served on Magnetar a third-party subpoena demanding document production and Rule 30(b)(6) depositions.  (Ex. A at 1).  IKB's extremely broad subpoena for third-party discovery demands that Magnetar (1) on January 15, 2010, produce an incredibly wide range of documents spanning over an eighteen month period, and (2)

on February 15, 2010, produce one or more Federal Rule of Civil Procedure 30(b)(6) deponents to give testimony on twenty-two topics.  (*Id.* at 1, 5, 10-12, 15-17).  The subject matter of the subpoena is so broad that it can be fairly characterized as nothing more than an impermissible fishing expedition.  (*Id.* at 10-12, 15-17).

The subpoena is not in any way limited to the Havenrock II transaction that forms the basis for the U.K. Litigation.  In fact, documents related to Haventrock II are conspicuously omitted from the laundry list of document production requests because Magnetar had no role whatsoever in that transaction.  Instead, the subpoena requests **virtually every single scrap of paper and electronic record** from other financial transactions in which Magnetar and Calyon were involved in any way.  (*Id.* at 10-12).  These include transactions in which Magnetar may merely have "proposed" that Calyon participate in as an arranger, placing agent or underwriter, and all of those in which Calyon did in fact perform one of those roles.  (*Id.* at 10).  The subpoena seeks all information related to Magnetar's purchase of notes or other securities issued in financial transactions known as Orion-1 or Orion-2 (neither of which have anything to do with Havenrock II); all CDO transactions (a type of complex financial transaction entered into by sophisticated investors) in which Magnetar invested and Calyon was the arranger, placing agent or underwriter; communications with collateral managers on such transactions; CDO structuring; purchase and management details of any assets underlying or collateralizing any CDO in which Magnetar invested and Calyon acted as the arranger, placing agent or underwriter; fees paid or received by Magnetar in such transactions; estimations and calculations of Magnetar's profits or losses; valuation, expected losses and credit ratings by a national rating organization; short sale, correlation trade, and credit default swap transactions; and risk analysis and risk mitigation by Magnetar and Calyon.  (*Id.* at 10-12).

The twenty-two topics of deposition testimony are equally, if not more expansive and include: CDO transactions known as Orion-1 and Orion-2 (again, neither of which are related to Havenrock II); communications "**not limited to**" those with Calyon about Orion-1 and Orion-2; any CDOs which did involve Magnetar and Calyon and even those which were only proposed to Magnetar for "possible investment"; any communications with a collateral manager for any CDO in which Magnetar invested for which Calyon acted as the arranger, placing agent or underwriter; purchases, management of assets, and fees paid or received in such transactions; profits or losses to Magnetar, Calyon, and any collateral manager for all such transactions; valuation of assets and credit ratings for such transactions; short sale, correlation trade, and credit default swap transactions in any CDO for which Calyon acted as the arranger, placing agent or underwriter regardless of whether Magnetar executed, requested, or merely had knowledge of the transaction; and the performance of any underlying assets or notes. (*Id.* at 15-17). The deposition topics expressly include all of the subject matters included in the responsive documents, as well as require Magnetar's 30(b)(6) deponent(s) to speak to Magnetar's efforts to search for responsive documents and to Magnetar's document retention policy. (*Id.* at 17).

The Definitions and Instructions used in the subpoena expand the individual requests to their widest possible breadth, making no effort whatsoever to tailor the requests. (*Id.* at 3-10). The source of the requested documents and testimony includes everything in the possession, custody, or control or known to be available to Magnetar, including *all* of Magnetar's:

> ***present and former*** officers, executives, partners, members, directors, trustees, employees, agents, representatives, attorneys, accountants, parent corporations, holding companies, subsidiaries, affiliates, divisions, departments, predecessors and/or successors-in-interest, any investment funds managed or advised by Magnetar

4

. . . and all other persons acting or purporting to act on behalf of Magnetar[.]

(*Id.* at 4-5 ¶ 8).  The subpoena affords an equally broad definition as to the persons and entities that constitute "Calyon."  (*Id.* at 4 ¶ 7).  The subpoena also defines "documents" as:

> any papers, writings, and/or electronically stored information including, but not limited to notes, contracts, memoranda, reports, financial records, models, computer or other business machine records, communications sent via any electronic means, including but not limited to internet and extranet compilations or written or graphic material stored in a tangible, electronic, mechanical or electric form, or any representation of any kind, including but not limited to, materials stored on or in computer disks, networks, mainframes, hard drives, CD-ROM, tapes or other forms of memory as well as back-up and deleted files of any computer storage device or media, whether located on or off site, from which the information can be obtained, as well as any draft, non-identical copy, and/or translation of the foregoing.

(*Id.* at 3 ¶ 3).  The very next Definition further expands the definition of "Electronically Stored Information" to include "[a]ll items stored on cache memories, magnetic disks (such as computer hard drives or floppy drives), optical disks (such as DVDs or CDs), magnetic tapes, microfiche, or on any other media for digital data storage or transmittal (*e.g.*, a personal digital assistant such as a Blackberry®)."  (*Id.* at 3-4 ¶ 4).

All of the eighteen broad categories for document production and nearly all of the twenty-two topics for deposition testimony demand all related "communications," which in turn is expansively defined in the subpoena as:

> any oral or written communication in the form of facts, ideas, inquiries or otherwise including, without limitation, face-to-face conversations or meetings, telephone conversations, correspondence, voice mail, e-mail, minutes of meetings (including confidential meetings), reports, notes, memoranda, transmittals of documents and the review, by any person, of documents within the possession custody or control of another person. [Communications] also include[s] information relating to oral communications and written communications whether or not any

such information or writings were themselves transmitted by their
author to any other persons.

(*Id.* at 4 ¶ 5 & at 13-14 ¶ 4).  The Instructions further require the production of all responsive

documents, including back-up tapes or email maintained at any of Magnetar's "locations, offices,

or in archives or in any other location . . . or with any person related in any way to [Magnetar]."

(*Id.* at 6 ¶ 4).  And the production of "[d]ocuments not otherwise responsive to a request for

production" if "such documents refer to, concern, or explain the documents called for by any

request for production and constitute routing slips, transmittal memoranda or letters, comments

evaluations, or similar documents."  (*Id.* at 7 ¶ 12).  It is clear even from these few examples that

IKB made absolutely no attempt to focus its requests.

  Compliance with IKB's subpoena would cost Magnetar a minimum of several

hundred thousand dollars.  (*See* Affidavit of Russell Daugerdas ("Daugerdas Aff."), at ¶ 9,

attached as Ex. E.)  According to the affidavit of Russell Daugerdas, a Magnetar Compliance

Officer, Magnetar stores its electronic information in two different locations, on Network Based

File Servers and on Local Hard Disks.  (*Id.* at ¶ 2).  There is an estimated total of over 100

terabytes of data stored on Magnetar's file servers.  (*Id.* at ¶ 3).  One terabyte is equal to 1,000

gigabytes and 1,000,000 megabytes.  (*Id.*).

  Collectively, Magnetar personnel maintain over 300 directories where they store

files.  (*Id.* at ¶ 4).  These directories contain tens of thousands or more electronic documents.

(*Id.*).  Backups of file servers are regularly performed and then archived offsite on a monthly

basis.  (*Id.* at ¶ 5).  To review these backups, Magnetar would first have to restore each backup in

its entirety.  (*Id.* at ¶ 6).  Due to the amount of space required for a full restoration, only one full

backup can be restored and analyzed at any given time.  (*Id.*)  In order to accommodate a

restoration of this type, Magnetar would need to purchase additional electronic storage as well as

additional tape drives, libraries, and other mechanisms to ensure that normal backup operations are not interrupted.  (*Id.* at ¶¶ 6-7).  In addition, certain documents on the Network Based File Server that are not electronically searchable will need to be reviewed manually.  (*Id.* at ¶ 8).

In total, it is estimated that a production of the type called for by IKB's subpoena would cost Magnetar a minimum of several hundred thousand dollars.  (*Id.* at ¶ 9).  This estimate does not include professional fees and costs of production.  (*Id.*).

In addition to the information stored on the Network Based File Servers, Magnetar would be required to search hundreds of local hard drives, millions of emails, thousands of physical documents, as well as other forms of media in order to begin to comply with IKB's discovery request.  (*Id.* at ¶ 10).  Such a "fishing expedition" would literally take place all over the world.  (*Id.*).  Again, the efforts pursued in these respects do not include the further professional fees and costs incurred with production.

### C.    Timing of IKB's Ex Parte Application

IKB's Defence to Calyon's claims was filed just over six weeks ago, on or about November 30, 2009.  (IKB's Defence, attached as Ex. D to IKB's § 1782 application).  IKB's ex parte § 1782 application completely failed to disclose to the Court the nascent stage of fact discovery in the U.K. Litigation and the fact that the vast majority, if not all, of the documents sought from Magnetar will be obtained from Calyon in due course.  According to the affidavit of James Danvers Baillieu, an English solicitor, which is being submitted to aid the Court in its understanding of the High Court's procedures, parties in U.K. litigation give, at a minimum, "standard disclosure," which consists of (a) documents on which each party relies, (b) the documents which adversely affect each party's own case, its opponent's case, or support another party's case, and (c) documents which each party is required to disclose by a relevant practice direction.  (Declaration of James Danvers Baillieu ("Baillieu Dec.") at ¶ 8, attached as Ex. D).

On information and belief, neither Calyon nor IKB have satisfied this initial discovery obligation.  Additionally, the High Court has scheduled a case management conference for February 26, 2010.  (*Id*. at ¶ 9).  In the normal course of English litigation, discovery between the parties would not begin until after the case management conference.  (*Id.*)  Magnetar is aware of no other scheduling orders, including for discovery, in the matter pending before the High Court.

Magnetar requested in a letter dated January 6, 2010 (attached as Exhibit B), that IKB withdraw its unduly burdensome and untimely subpoena.  IKB responded by letter on January 8, 2010 (attached as Exhibit C) that it refused to do so, and this Motion followed.

## III.   ARGUMENT

IKB's discovery request is so grossly burdensome and intrusive that the Court should exercise its discretion and vacate the order granting IKB's ex parte § 1782 application. Although this alone is reason enough to vacate the order, the Court should also vacate the order because IKB's attempt at discovery through this Court is nothing but an end-run around English discovery procedures.   In any event, the Court should quash IKB's subpoena and award Magnetar fees and costs.

### A.   The Court Should Exercise Its Discretion and Vacate the Order Granting IKB's Application Because IKB's Request Is Unduly Intrusive and Burdensome and Because It Is Nothing More Than an End-Run Around English Discovery Rules

If certain statutory requirements are met, a district court has wide discretion to deny or permit discovery pursuant to § 1782.  But, even if those statutory requirements are satisfied, a court is under no obligation whatsoever to grant a § 1782 petition.  *See, e.g.*, *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). ("As earlier emphasized, a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to so."); *Kestrel Coal Pty. Ltd. V Joy Global Inc.*, 362 F.3d 401, 406 (7th Cir. 2004)

("Section 1782 gives district judges a source of authority, but use of that power depends on a good reason.").  In fact, as demonstrated below, courts routinely deny § 1782 applications when the discovery sought is unduly burdensome and intrusive, even if the statutory requirements of § 1782 are met.

In order for a subpoena to be permissible under § 1782, (1) the applicant must be an interested party, (2) the person from whom discovery is sought must reside in the district where the application is made, and (3) the discovery must be for use in a proceeding (4) in a foreign or international tribunal.  *See* 28 U.S.C. § 1782(a); *Intel*, 542 U.S. at 246.  Even if these statutory requirements are satisfied, a court's inquiry cannot end there.  The Supreme Court has articulated several factors to guide a district court's discretion under § 1782(a), including (1) whether the subpoena is "unduly intrusive or burdensome"; (2) "the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether "the person from whom discovery is sought is a participant in the foreign proceeding[.]"[1]  *Id.* at 264-65.

1.      The Subpoena Places an Undue and Intrusive Burden on Magnetar

The *Intel* factors establish that § 1782 is not meant to be used by a litigant in a foreign proceeding to unduly burden a non-party in the United States with discovery requests.  Indeed, courts have held that an analysis of the burden factor alone is sufficient to deny a § 1782 application.  *See In re Heraeus Kulzer*, No. 3:09-MC-08 CAN, 2009 WL 961229, at *5 (N.D.

---

[1]  This fourth factor recognizes that nonparties to a foreign proceeding are often difficult for those proceedings to reach directly if the nonparties are outside the jurisdiction of the foreign tribunal.  But, in light of the fact that the vast majority, if not all, of the discovery sought by IKB can be obtained from Calyon as described above, this factor does not weigh strongly in favor of IKB here.

Ind. Apr. 8, 2009) ("[A]n analysis under the [burden] factor alone is sufficient for this Court to deny Heraeus's request."); *In re Apotex Inc.*, No. M12-160, 2009 WL 618243, at *3-4 (S.D.N.Y. Mar. 9, 2009) (vacating a § 1782 order and subpoena based solely upon the court's finding that the discovery requests were unduly burdensome and intrusive). Like in those cases, the undue burden imposed by IKB's discovery requests alone warrants the Court exercising its discretion and vacating the § 1782 order.

Courts consider several factors when evaluating whether a subpoena is unduly burdensome, all of which support Magnetar's position. These factors include relevance of the discovery sought, the requesting party's need, the breadth and specificity of the document requests, and the degree of burden imposed by the request on the subpoenaed party. *Northwestern Memorial Hospital v.* Ashcroft, 362 F.3d 923, 927 (7th Cir. 2004); *Bond v. Utreras*, No. 04 C 2617, 2006 WL 1806387, at *4 (N.D. Ill. June 27, 2006). Moreover, non-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue:

> Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to *special weight* in evaluating the balance of competing needs.

*United States v. Amerigroup Ill., Inc.*, No 02 C 6074, 2005 WL 3111972, at *4-5 (N.D. Ill. Oct. 21, 2005) (quoting *In re Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)). Application of these factors here unquestionably establishes that the subpoena places an undue burden on Magnetar and for that reason, the § 1782 order should clearly be vacated.

a.    <u>IKB Cannot Justify Its Pursuit of Discovery From Magnetar Because the Information Sought Is Not Relevant to the Underlying U.K. Litigation</u>

IKB cannot justify its pursuit of the documents and deposition testimony sought from Magnetar. *See Patterson v. Burge*, No. 03 C 4433, 2005 WL 43240, at *1 (N.D. Ill. Jan. 6, 2005) (when a fish objects to a fishing expedition under Rule 45(c), "the fisherman is called upon to justify his pursuit") (citing *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir. 2004); *Waddell v. Greyhound Lines, Inc.*, Civil No. 08-2014-Ma/P, 2008 WL 4982633, at *1 (W.D. Tenn. Nov. 19, 2008) ("party seeking discovery must demonstrate that the requests are relevant to the claims or defenses in the pending action").  The underlying U.K. Litigation involves a contractual dispute between Calyon and IKB that has nothing whatsoever to do with Magnetar.  IKB argues that its defense in the U.K. Litigation thus far has "placed into issue" various topics that render discovery from Magnetar appropriate.  However, these "issues" have absolutely nothing to do with Magnetar.  According to IKB, these issues involve Calyon's knowledge of the risks associated with Havenrock II, Calyon's knowledge and experience in the areas of securitizations and structured credit, and Calyon's involvement in developing structured products in relation to U.S. sub-prime mortgage assets.  Merely mentioning Calyon's limited business relationship with Magnetar, which had absolutely nothing to do with Havenrock II, should not open the door to sweeping discovery requests from a third party about Calyon's knowledge generally with regard to securitization and structured credit markets.

In addition, many requests contained in the subpoena are clearly nothing more than fishing expeditions that have absolutely nothing to do with Calyon or the U.K. Litigation. To cite just one example, the subpoena requests documents regarding Magnetar's profits in any CDO in which Calyon participated.  Such documents have absolutely no relevance to the U.K. Litigation against Calyon and instead encroach on Magnetar's proprietary information. IKB's

11

interest in obtaining discovery that is, at best, "potentially germane" to IKB's defense in the U.K. Litigation, is significantly outweighed by the unduly intrusive burden on Magnetar. *Amerigroup Ill., Inc.*, 2005 WL 3111972, at *7 (refusing to order the production of "potentially germane" emails where burden to non-party is significant and undue); *Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003) (upholding district court's quashing of a subpoena to a non-party and noting the significant burden on the non-party as compared to the relevance of the materials sought).

      b.    <u>The Requested Documents and Rule 30(b)(6) Testimony Can Be Obtained From Calyon and Are Not Needed from Magnetar</u>

IKB's ex parte application describes four broad categories of information IKB intends to seek from Magnetar. However, the information sought—**Calyon's market ambitions**, **Calyon's assessment** of the assets acquired in connection with the CDOs **Calyon arranged and marketed** to IKB,[2] and **Calyon's practices** in structuring and marketing those deals—is obtainable from Calyon alone. Indeed, the application specifies that the "discovery sought . . . involves only those **Calyon-arranged** CDO transactions in which Magnetar and **Calyon** were involved." (IKB's Mem. in Support of Application, at 7). Because Calyon is a party to the U.K. Litigation, the need for § 1782 discovery from Magnetar, a non-party, is greatly diminished, if not eliminated entirely. The English court has jurisdiction over Calyon and can itself order Calyon to produce the evidence.

In addition, acknowledging that "the unwanted burden thrust upon nonparties is a factor entitled to special weight in evaluating the balance of competing needs", it is appropriate to require discovery of a party *before* burdening a non-party like Magnetar. *See Cusumano*, 162

---

[2] Calyon also seeks the hedge positions placed by CDO participants with respect to CDOs arranged and sold by Calyon. Not only can Magnetar not provide this information, but this request is entirely irrelevant to the underlying litigation. Hedge positions are placed on a portfolio as a whole and not on individual CDOs.

F.3d at 717 (fact that information was available by direct discovery weighed in favor of finding

undue burden on subpoenaed non-party); *Haworth Inc. v. Herman Miller, Inc.*, 998 F.2d 975,

978 (Fed. Cir. 1993) ("district court could properly require [defendant] to seek discovery from its

party opponent before burdening the nonparty . . . with this ancillary proceeding.").   In fact,

Courts have held that in instances where documents requested for production can be obtained

from a party, it is inappropriate to burden a non-party with that obligation.   *See Xcaliber Intern.*

*Ltd., L.L.C. v. Ieyoub*, No. 04-0069, 2006 WL 3412265, at *4 (E.D. La. Nov. 27**,** 2006) ("The

Court concludes that, in this case, requiring the Department of Revenue, a non-party to the

litigation, to produce documents that Xcaliber could just as easily request from the Attorney

General, a party to the litigation, would result in an undue burden on the Department of

Revenue.").

IKB's filings state no reason why it cannot receive most, if not all, of the

material sought in the subpoena from Calyon.  IKB did not explain how Magnetar's production

of documents and/or Rule 30(b)(6) testimony would add to the disclosure Calyon will issue in

the U.K. Litigation, something Calyon has not yet done.  The Federal Rules allow a district court

to use its discretion to deny discovery requests if the material sought is "unreasonably

cumulative."  Fed. R. Civ. P. 26(b)(2).   Without having first requested and reviewed the

information from Calyon, IKB cannot credibly argue that the information it seeks from Magnetar

is necessary to its defense and is not unreasonably cumulative.  Under these circumstances, the

Court should exercise its discretion and vacate the § 1782 ex parte application.

> c.    IKB's Discovery Requests Are Incredibly Overbroad and Place an Undue Burden on Magnetar, a Non-Party

As set forth above, IKB's requests for information are incredibly broad and its

Definitions and Instructions are used to expand those already wide requests to their widest

possible breadths.  IKB's incredibly wide document requests demand all information including, but not limited to:

- transactions in which Magnetar may have merely "proposed" that Calyon participate as an arranger, placing agent or underwriter, and all of those in which Calyon did in fact perform one of those roles;

- Magnetar's purchase of notes or other securities issued by Orion-1 or Orion-2 (financial transactions completely unrelated to Havenrock II);

- all CDO transactions in which Magnetar invested and Calyon was the arranger, placing agent or underwriter;

- communications with collateral managers on such transactions;

- CDO structuring;

- purchase and management details of any assets underlying or collateralizing any CDO in which Magnetar invested and Calyon acted as the arranger, placing agent or underwriter;

- fees paid or received by Magnetar in such transactions;

- estimations and calculations of Magnetar's profits or losses;

- valuation, expected losses and credit ratings by a national rating organization;

- short sale, correlation trade, and credit default swap transactions; and

- risk analysis and risk mitigation by Magnetar and Calyon.  (Ex. A, at 10-12).

Likewise, IKB's topics for deposition testimony are equally expansive, and, as explained above and in the Daugerdas Affidavit attached hereto as Exhibit E, compliance with IKB's subpoena would require massive amounts of work and would cost at least several hundred thousand dollars.    (Ex. E, at ¶ 9).    Such cost (not to mention additional manpower) unquestionably is an undue burden.  *See also Guy Chemical Co., Inc. v. Romaco AG*, 243 F.R.D. 310, 312 (N.D. Ind. 2007) ($7,000 held to be a substantial amount of money for production of documents and records from a third-party such that the information requested is not reasonably accessible absent undue burden).

The subpoena's overly broad terms clearly demonstrate that IKB is attempting to conduct an impermissible, premature fishing expedition. The time and resources it would cost Magnetar to comply with the subpoena alone subject Magnetar to an undue burden within the meaning of Rule 45(c)(3)(A)(iv). For these reasons, the Court should vacate the § 1782 order.

> d.    <u>The Time Period Covered By the Subpoena Also Places an Undue Burden on Magnetar, a Non-Party</u>

IKB's ex parte § 1782 application suggested that the subpoena was somehow limited because it only requests documents from an eighteen month time period. However, that suggestion is entirely misleading. IKB failed to disclose to the Court the tremendous complexity and scope of even a single transaction in the CDO market, let alone the volume of activity in the market that occurred during the specified time period, including deals that were actually completed and those that were merely evaluated or proposed. Additionally, IKB's purported limitation is almost entirely meaningless because the time period of the subpoena represents the majority of the time during which Magnetar made investments of this type (*see* Daugerdas Aff., at ¶ 15) , as was likely the reason IKB selected this so-called "limited" time period. In addition, the subpoena requests not only a broad definition of "documents" that were **created** from January 1, 2006 through June 30, 2007, but also any and all documents that were "**modified**" during this time period. (Ex. A, at 5 ¶ 13). The time period which IKB trumpeted to the Court as limiting the scope of its subpoena entirely fails to do so.

As stated above, all of the factors courts consider when determining whether a subpoena constitutes an undue burden weigh heavily in favor of Magnetar, a third-party to the underlying foreign litigation. IKB cannot establish that the discovery sought is relevant to the underlying litigation. IKB does not need the discovery from Magnetar but can instead get it from its party opponent. The requests made in the subpoena are so broad that they amount to

nothing more than an impermissible fishing expedition.   Moreover, the burden imposed on Magnetar is immense in both cost and manpower.   Because the subpoena is an impermissible undue burden on a third party, the Court should exercise its discretion and vacate the § 1782 order obtained by Calyon on ex parte application.

2.      <u>The Court Should Also Vacate the Ex Parte § 1782 Order Because It Is an</u><br><u>End-Run Around English Discovery Rules</u>

This Court should also vacate the grant of IKB's ex parte discovery application because it is nothing more than an attempt to circumvent the proof-gathering procedures and restrictions followed by the English courts.   An English court would not allow for the pursuit of broad discovery demands from a non-party such as Magnetar under these circumstances. "Clearly, the statute is not intended to allow unfettered access to the United States' courts or to encourage foreign parties to 'forum shop,' whenever the procedures of their home tribunal are less favorable to their case." *Kulzer*, 2009 WL 961229, at *4.

Disclosure may be sought against third parties under English Civil Procedure Rule 31.17.  (Baillieu Decl., at ¶ 4).  That rule contains two important threshold conditions: (1) the documents must be likely to support the case of the applicant or adversely affect the case of one of the other parties, and (2) disclosure must be necessary in order to dispose of the claim fairly or to save costs.  (*Id.*)  For the reasons stated above, IKB has not shown how disclosure from Magnetar is either likely to support IKB's defense or necessary to the U.K. Litigation, particularly when all relevant documents could be obtained from Calyon alone.

Even if IKB could cobble together a reason why discovery from Magnetar is likely to support its case and is necessary to the U.K. Litigation, the English Court of Appeal has noted that disclosure from third parties is the exception rather than the rule.  (*Id.* at ¶ 6).   An English court exercising its discretion would decline to make a disclosure order against a non-

16

party if the documents sought could instead be obtained from a party to the litigation. (*Id.* at ¶ 7). As parties to the U.K. Litigation, Calyon and IKB will in due course exchange evidence pursuant to "standard disclosure." (*Id.* at ¶ 8). Each of IKB's discovery demands from Magnetar involve Calyon, and IKB has failed to demonstrate how the scope of the documents demanded from Magnetar would not be covered by the scope of Calyon's standard disclosure in the U.K.

Perhaps IKB has sought discovery from Magnetar in this court for fear that the English court would not allow such broad discovery against Calyon—another reason the Court should deny IKB's discovery request. *See, e.g.*, *Kestrel*, 362 F.3d at 406 (holding that the district court judge abused his discretion in ordering the production of documents after the Justice in the Australia proceeding determined there was no need for the documents at the time they were ordered produced). Regardless, it is entirely premature for IKB to be requesting duplicative discovery from Magnetar, a non-party. The subpoena is a blatant attempt to circumvent the proof-gathering procedures of the English courts. *See generally*, *Kulzer*, 2009 WL 961229, at *4 ("this court does not agree that granting Heraeus access to Unites States' discovery procedures in order to avoid more restrictive German procedures is in keeping with the purpose of the statute."). This Court should not countenance such behavior, and should bar the requested discovery by vacating the § 1782 order.

**B.      The Court Should Quash IKB's Subpoena Because It Subjects Magnetar, a Non-Party, to Undue Burden**

Federal Rule of Civil Procedure 45(c)(3)(A)(iv) mandates that a court "shall quash or modify" a subpoena if it "subjects a person to undue burden." Unlike the discretionary language in other rules, the language in Rule 45 is a "command." *Amerigroup*, 2005 WL 3111972, at *2 (quoting *Heidelberg*, 333 F.3d at 41). For the reasons stated above, IKB's overly broad and premature subpoena places an undue burden on Magnetar, a non-party to the

underlying U.K. Litigation.   Accordingly, and pursuant the mandate of the Federal Rules, this Court should quash IKB's subpoena.

### C. The Court Should Impose an Appropriate Sanction on IKB for Imposing an Undue Burden on Magnetar

In addition to vacating the § 1782 order and quashing the subpoena, this Court should enter an order for sanctions against IKB, including but not limited to Magnetar's reasonable costs and fees incurred in pursuing this Motion.   Under the Federal Rules, a "party or attorney responsible for issuing and serving a subpoena **must** take reasonable steps to avoid imposing undue burden or expense on a party subject to the subpoena."   Fed. R. Civ. P. 45(c)(1). Courts are permitted to "enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply."   *Id.*

"When a subpoena should not have been issued, literally everything done in response to it constitutes 'undue burden or expense' within the meaning of Civil Rule 45(c)(1)." *CareToLive v. Von Eschenbach*, No. 2:07-cv-729, 2008 WL 552431, at *3 (S.D. Ohio Feb. 26, 2008) (citation omitted) (imposing $6,000 in sanctions).   The sweeping requests for document production and deposition testimony from a third-party, combined with IKB's failure to request or receive any discovery disclosures from Calyon prior to seeking the same from Magnetar, clearly demonstrates that IKB has made no effort whatsoever to avoid imposing undue burden and expense on Magnetar, a non-party.

Imposing sanctions here would be entirely consistent with the "primary" purpose of the Rule 45's sanctions provision, which is designed "to protect 'a *non-party* witness as a result of a misuse of the subpoena.'"   *Molefi v. Oppenheimer Trust*, No. 03 CV 5631, 2007 WL 538547, at *2 (E.D.N.Y. Feb. 15, 2007) (quoting Fed. R. Civ. P. 45(c)(1) advisory committee's

note (1991) and imposing sanctions and attorneys' fees); *see also Theofel v. Farley-Jones*, 359 F.3d 1066, 1071-72 (9th Cir. 2004), *cert. denied* 543 U.S. 813 (noting that the district court quashed the subpoena and awarded sanctions after finding that "'the subpoena, on its face, was massively overbroad' and 'patently unlawful,' that it 'transparently and egregiously' violated the Federal Rules, and that defendants 'acted in bad faith' and showed 'at least gross negligence in the crafting of the subpoena'").

Magnetar attempted to conserve judicial and party resources and to avoid the need for filing this Motion by timely tendering written objections to IKB's subpoena and requesting that IKB withdraw its grossly premature and unduly burdensome subpoena.  (*See*, Ex. B). Because IKB refused to do so, Magnetar was forced into filing this Motion.  Accordingly, Magnetar respectfully requests that this Court award sanctions against IKB in the amount of Magnetar's reasonable attorney's fees and expenses incurred as a result.

## IV.    CONCLUSION

For the foregoing reasons, Magnetar respectfully requests that this Court (1) vacate the order granting IKB's ex parte 28 U.S.C. § 1782 application, (2) quash the resulting subpoena served on Magnetar, and (3) impose an appropriate sanction on IKB, including Magnetar's reasonable costs and expenses in responding to the subpoena, including the preparation of this Motion.  Upon request, Magnetar will submit detailed evidence of the costs and fees associated with this motion practice.

Respectfully submitted,

Dated:  January 15, 2010        By:    /s/ Ronald S. Betman

Robert Y. Sperling (rsperling@winston.com)
Ronald S. Betman (rbetman@winston.com)
Thomas L. Kirsch II (tkirsch@winston.com)
Rebecca S. Bradley (rbradley@winston.com)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
(312) 558-5600 (telephone)
(312) 558-5700 (facsimile)
*Attorneys for Magnetar Capital LLC*

## **Certificate of Service**

I, Thomas L. Kirsch II, an attorney, hereby certify that on January 15, 2010, a true and correct copy of Magnetar Capital LLC's Memorandum of Law in Support of Its Motion to Vacate the Grant of IKB Deutsche Industriebank AG's Ex Parte 28 U.S.C. § 1782 Application and to Quash IKB's Subpoena was served on all counsel of record via the court's ECF system.

/s/      *Thomas L. Kirsch II*

## INDEX OF EXHIBITS

**Exhibits**

Exhibit A:     IKB's Subpoena Issued Pursuant to 28 U.S.C. § 1782

Exhibit B.:    Magnetar's January 6, 2010 Letter

Exhibit C.:    IKB's January 8, 2010 Letter

Exhibit D.:    Declaration of James Danvers Baillieu

Exhibit E.:    Affidavit of Russell Daugerdas

# EXHIBIT A

AO 88 (Rev  12/06) Subpoena in a Civil Case

Issued by the
**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF ILLINOIS

In re: Application of IKB DEUTSCHE
INDUSTRIEBANK AG for an Order to Conduct
Discovery for Use in a Foreign Legal Proceeding
Pursuant to 28 U.S.C. § 1782

**SUBPOENA IN A CIVIL CASE**

Civil Action No.: 09-7852

TO:   Magnetar Capital, LLC
      1603 Orrington Avenue, 13th Floor
      Evanston, IL  60201

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ ONE OR MORE PERSONS DESIGNATED BY YOU PURSUANT TO FED. R. CIV. PR. 30(b)(6) ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition to be recorded by stenographic means and videotape, on the topics described in **Schedule B**.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Novack & Macey LLP<br>100 North Riverside Plaza<br>Chicago, IL  60606-1501 | February 15, 2010, 10:00 a.m. and continuing thereafter until completed. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of any and all documents listed in **Schedule A** at the place, date, and time specified below:

| PLACE | DATE AND TIME |
|---|---|
| Novack & Macey LLP<br>100 North Riverside Plaza<br>Chicago, IL  60606-1501 | January 15, 2010, 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| *[signature]*<br>Attorney for Applicant, IKB Deutsche Industriebank AG | December 23, 2009 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
John Haarlow Jr., Esq.
Novack & Macey LLP
100 North Riverside Plaza
Chicago, IL  60606-1501
312 419 6900

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on Reverse)

20521/2
12/23/09 329436_1.DOCX

.Q 88 (Rev. 12/06) Subpoena in a Civil Case

---

## PROOF OF SERVICE

|  | DATE | | PLACE | |
|--|------|--|-------|--|

SERVED

| SERVED ON (PRINT NAME) | | MANAGER OF SERVICE |
|---|---|---|

| SERVED BY (PRINT NAME) | | TITLE |
|---|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained n the Proof of Service is true and correct.

Executed on _____

| | DATE | SIGNATURE OF SERVER |
|--|------|---------------------|

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)   A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorneys' fees.

(2)   (A)   A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)   Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)   (A)   On a timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)   fails to allow reasonable time for compliance;

(ii)   requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)   requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv)   subjects a person to undue burden.

(B)   If a subpoena

(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)   requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)   requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)   DUTIES IN RESPONDING TO SUBPOENA.

(1)   (A)   A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B)   If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it in or a form or forms that are reasonably usable.

(C)   A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D)   A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2)   (A)   When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B)   If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claims and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e)   CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A)

## SCHEDULE A

## DEFINITIONS

1.     "Revealing," "Concerning," and/or "Reflecting," means referring to, revealing, pertaining to, discussing, connected with, commenting on, responding to, supporting, containing, evidencing, showing, memorializing, describing, analyzing, reflecting, compromising, and/or constituting.

2.     "Related to" shall mean constituting, pertaining to, regarding, referring to, concerning, setting forth, describing, explaining, summarizing, showing or being in any way logically or factually connected with the matter described.

3.     "Document" or "Documents" refers to any papers, writings, and/or electronically stored information including, but not limited to, notes, contracts, memoranda, reports, financial records, models, computer or other business machine records, communications sent via any electronic means, including but not limited to internet and extranet compilations or written or graphic material stored in a tangible, electronic, mechanical or electric form, or any representation of any kind, including but not limited to, materials stored on or in computer disks, networks, mainframes, hard drives, CD-ROM, tapes or other forms of memory as well as back-up and deleted files of any computer storage device or media, whether located on or off site, from which the information can be obtained, as well as any draft, non-identical copy, and/or translation of the foregoing.

4.     "Electronically Stored Information" shall include, without limitation, the following:

> (a)     Information that is generated, received, processed, recorded, or accessed by computers and other electronic devices, including but not limited to e-mail;
>
> (b)     Internal or external web sites;
>
> (c)     Output resulting from the use of any software program; and

-3-

(d)   All items stored on cache memories, magnetic disks (such as computer hard drives or floppy drives), optical disks (such as DVDs or CDs), magnetic tapes, microfiche, or on any other media for digital data storage or transmittal (e.g., a personal digital assistant such as a Blackberry®).

5.   "Communication," "communicate" or equivalent language means any oral or written communication in the form of facts, ideas, inquiries or otherwise including, without limitation, face-to-face conversations or meetings, telephone conversations, correspondence, voice mail, e-mail, minutes of meetings (including confidential meetings), reports, notes, memoranda, transmittals of documents and the review, by any person, of documents within the possession, custody or control of another person.  The terms also include information relating to oral communications and written communications whether or not any such information or writings were themselves transmitted by their author to any other persons.

6.   A document or writing or other communication "relates" to or "concerns" or is "regarding" a particular fact, matter or event when it proves or disproves, or tends to prove or disprove, that fact, matter, or event, or contains information concerning, explaining, relating, discussing, pertaining or providing a background for understanding that fact, matter or event, or is evidence of or a result of that fact, matter or event, or could lead to additional relevant information concerning, explaining, relating, or providing a background for understanding the fact, matter or event, or was produced, altered or signed as a part of or as a result of that fact, matter or event.

7.   "Calyon" means Calyon Crédit Agricole CIB and/or its present and former officers, executives, partners, directors, trustees, employees, agents, representatives, attorneys, accountants, parent corporations, holding companies, subsidiaries, affiliates, divisions, departments, predecessors and/or successors-in-interest, and all other persons acting or purporting to act on behalf of Calyon Crédit Agricole CIB.

8.   "You," "Your" or "Magnetar" means Magnetar Capital, LLC and/or and its present and former officers, executives, partners, members, directors, trustees, employees,

-4-

agents, representatives, attorneys, accountants, parent corporations, holding companies, subsidiaries, affiliates, divisions, departments, predecessors and/or successors-in-interest, any investment funds managed or advised by Magnetar Capital, LLC, and all other persons acting or purporting to act on behalf of Magnetar Capital, LLC.

9.      "Collateralized Debt Obligation" or "CDO" refers to a type of structured finance vehicle under which classes of notes, also known as tranches, are sold to investors, who may then resell them in the secondary market. Those notes are issued pursuant to the terms of an indenture. The proceeds from the sale of the notes (and other securities) are used to purchase a portfolio of investments. Cash flows generated by that portfolio serve as security for, and are used to repay, the notes. The portfolio is managed by a collateral manager in accordance with the CDO's governing documents.

10.      "Orion-1" refers to the Collateralized Debt Obligation for which Orion 2006-1, Ltd. acted as issuer.

11.      "Orion-2" refers to the Collateralized Debt Obligation for which Orion 2006-2 CDO Ltd. acted as issuer.

12.      "Nationally Recognized Statistical Rating Organization" or ("NRSRO") refers to any entity designated as a Nationally Recognized Statistical Rating Organization by the United States Securities and Exchange Commission.

13.      The document requests listed below seek documents created and/or modified for the period from January 1, 2006 through June 30, 2007.

## INSTRUCTIONS

1.      The responsive documents should be produced in the manner prescribed by the Federal Rules of Civil Procedure ("FRCP") and any applicable Local Civil Rule.

2.      If any part of the request is objected to, the reason for the objection should be stated with particularity. If an objection is made to part of any item or category set forth in a request, the part should be specified.

3.    Each request and subparagraphs or subdivisions thereof shall be construed independently, and no request, subparagraph, or subdivision shall be construed as creating a limitation upon any other request, subparagraph, or subdivision.

4.    The documents to be produced in response to these requests are all responsive documents in Your possession, custody, or control, or known to be available to You, regardless of whether such documents are possessed directly by You or Your agents, advisors, employees, representatives, attorneys, consultants, successors-in-interest, or other persons or entities acting on Your behalf or subject to Your control, and whether they are maintained at any of Your locations, offices, or in archives or in any other location (including back-up tapes or electronic mail) or with any persons related in any way to You.

5.    Any reference in these document requests to an individual or person includes any and all agents, advisors, employees, representatives, attorneys, successors-in-interest, and all other persons or entities acting on his, her, or its behalf or under his, her, or its control.

6.    Any reference in these document requests to any corporation, partnership, association, governmental entity or agency, or other entity includes the present and former officers, executives, partners, members, directors, trustees, employees, agents, representatives, attorneys, accountants, and all other persons acting or purporting to act on behalf of such corporation, partnership, association, or entity and any of their parent corporations, holding companies, subsidiaries, affiliates, divisions, departments, predecessors and/or successors-in-interest.

7.    Where a request calls for information that is not available to You in the form requested, but is available in another form or can be obtained, in whole or in part, from other data in Your possession or control, You must state so and either supply the information requested in the form in which it is available, or supply the data from which the information requested can be obtained.

8.      You shall produce the original and all non-identical copies, including all drafts, of each responsive document. If You are unable to produce the original of any document, You shall produce the best available copy and all non-identical copies, including all drafts.

9.      If any requested document is not or cannot be produced in full, You shall produce it to the extent possible, indicating what document or portion of such document is not or cannot be produced and the reason why it is not or cannot be produced.

10.     Each document produced must include all attachments and enclosures.

11.     Documents attached to each other shall not be separated.

12.     Documents not otherwise responsive to a request for production shall be produced if such documents refer to, concern, or explain the documents called for by any request for production and constitute routing slips, transmittal memoranda or letters, comments, evaluations, or similar documents.

13.     In accordance with FRCP 45(d)(1)(A), all documents shall be produced as they are kept in the ordinary course of business or shall be organized and labeled to correspond with the categories in this subpoena, and identifying the name of the person from whose files the documents were produced.

14.     Electronically Stored Information shall be produced as follows:

     (a)    Electronically Stored Information may be provided on CD/DVD, File Transfer Protocol site, portable hard or flash drive, or other reasonably accessible media format;

     (b)    Produce all documents in TIFF format with Optical Character Recognition ("OCR") and standard load files for Concordance, and include all metadata (including but not limited to document boundaries and custodian identification information) associated with any file converted to TIFF. In addition to producing TIFF files with OCR, metadata, and standard load files, native files should be produced for any Microsoft PowerPoint® presentations containing audio or video, any Microsoft Excel® documents, any Microsoft Access® databases, or documents created under equivalent software packages.

(c)     Data files should not be zipped, encrypted, or otherwise restricted or proprietarily protected for specific use. If the native file format is derived from software not accessible with Microsoft Office applications (or other common applications), please state so in response to the particular request.

15.     Each request shall be responded to separately. Nevertheless, a document that is responsive to more than one request may be produced for one request and incorporated by reference in another response, provided that the relevant, corresponding portion is so labeled or marked.

16.     If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this lawsuit or unless otherwise permitted by the Court.

17.     If any document requested herein was at one time in existence, but has been lost, discarded, destroyed, transferred to others not subject to Your control, or otherwise disposed of, You shall furnish a list identifying each such document and setting forth the following information with respect to each such document: its date, author(s), sender(s), addressee(s) and recipient(s), subject matter, length, attachments, and location in which it was maintained. In each instance, explain the circumstances of its loss, discarding, or destruction, including the person(s) responsible for authorizing the disposition and the date thereof, and provide a description of Your efforts to locate the document and copies of it.

18.     No part of a document request may be left unanswered merely because an objection is interposed to another part of the document request. If You object to any document request or sub-part thereof, You must state with specificity Your objection and all grounds therefore. Any ground not stated will be waived.

19.     If You contend that it would be unduly burdensome to obtain and provide all of the documents called for in response to these requests, or any portion thereof, then in response to each such request You shall:

    (a)    produce all documents and information available to You without undertaking what You contend to be an unreasonable burden; and

    (b)    set forth the particular grounds on which You contend that additional efforts to obtain such documents and information would be unduly burdensome.

20.    If any document is withheld under any claim of privilege, including without limitation, the work product doctrine or attorney-client privilege, Your answer should provide the following with respect to such information:

    (a)    the type of document;

    (b)    the date of the document;

    (c)    the names of its author(s) or preparer(s) and an identification by employment and title of each such person;

    (d)    the name of each person who was sent or furnished with, received, viewed or has had custody of the document or a copy thereof together with an identification of each such person;

    (e)    its title and reference, if any;

    (f)    a description of the document sufficient to identify it without revealing the information for which privilege is claimed;

    (g)    the type of privilege asserted;

    (h)    a description of the subject matter of the document in sufficient detail to allow the Court to adjudicate the validity of the claim for privilege; and

    (i)    the paragraph of this request to which the document relates.

21.    Any requests propounded in the disjunctive shall also be read as if propounded in the conjunctive and vice versa. Any request propounded in the singular shall also be read as if propounded in the plural and vice versa. Any request propounded in the present tense shall also be read as if propounded in the past tense and vice versa.

22.    These document requests are continuing in nature, and Your responses thereto shall be supplemented if and as additional responsive information or documents become known

-9-

to You after service of Your responses hereto.  Supplemental responses shall be served and additional documents shall be made available promptly upon discovery of such information.

## DOCUMENTS TO BE PRODUCED

A.     All documents (including communications) related to Orion-1 or Orion-2.

B.     All documents (including communications) related to any CDO transaction in which You invested, or that was proposed to You for investment. and for which Calyon acted as the arranger, placing agent or underwriter.

C.     All documents (including communications) related to any CDO transaction that You proposed that Calyon participate in as arranger, placing agent or underwriter.

D.     All documents (including communications) concerning Your purchase of any notes or other securities issued by Orion-1 or Orion-2.

E.     All documents (including communications) concerning Your purchase of any notes or other securities issued in connection with a CDO for which Calyon acted as the arranger, placing agent or underwriter.

F.     All communications You had with any collateral manager for any CDO in which You invested for which Calyon acted as the arranger, placing agent or underwriter.

G.     All documents (including communications) concerning the structuring of any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

H.     All documents (including communications) concerning the purchase or management of any assets underlying or collateralizing any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

I.     All documents (including communications) concerning the fees paid or received by or among Magnetar, Calyon and/or the collateral manager for any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

J.     All documents (including communications) concerning the profit or loss (or the estimation or calculation of same) for Magnetar, Calyon and/or the collateral manager for any

CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

K.     All documents (including communications) concerning the valuation, expected losses or NRSRO credit ratings of any assets underlying any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

L.     All documents (including communications) concerning the valuation of any notes issued in connection with any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

M.     All documents (including communications) concerning the anticipated or actual credit ratings assigned by any NRSRO for any notes issues by a CDO for which Calyon acted as the arranger, placing agent or underwriter.

N.     All documents (including communications) concerning the subordination of any notes issued in connection with any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

O.     All documents (including communications) concerning any short sale, correlation trade, credit default swap or other derivative transaction You executed, or that You requested be executed, with respect to any investment You made in any CDO for which Calyon acted as the arranger, placing agent or underwriter.

P.     All documents (including communications) concerning risk and risk analysis and risk mitigation by You and/or Calyon in any CDO for which Calyon acted as the arranger, placing agent or underwriter.

Q.     All documents (including communications) concerning any short sale, correlation trade, credit default swap or other derivative transaction that was executed with respect to any CDO in which You invested for which Calyon acted as the arranger, placing agent or underwriter

R.     For any CDO for which Calyon acted as the arranger, placing agent or underwriter and in which You invested, all documents (including communications) concerning

the performance of either the assets underlying that CDO or the notes issued in connection with that CDO.

## SCHEDULE B

## DEFINITIONS

1.     "Revealing," "Concerning," and/or "Reflecting," means referring to, revealing, pertaining to, discussing, connected with, commenting on, responding to, supporting, containing, evidencing, showing, memorializing, describing, analyzing, reflecting, compromising, and/or constituting.

2.     "Related to" shall mean constituting, pertaining to, regarding, referring to, concerning, setting forth, describing, explaining, summarizing, showing or being in any way logically or factually connected with the matter described.

3.     "Document" or "Documents" refers to any papers, writings, and/or electronically stored information including, but not limited to, notes, contracts, memoranda, reports, financial records, models, computer or other business machine records, communications sent via any electronic means, including but not limited to internet and extranet compilations or written or graphic material stored in a tangible, electronic, mechanical or electric form, or any representation of any kind, including but not limited to, materials stored on or in computer disks, networks, mainframes, hard drives, CD-ROM, tapes or other forms of memory as well as back-up and deleted files of any computer storage device or media, whether located on or off site, from which the information can be obtained, as well as any draft, non-identical copy, and/or translation of the foregoing.

4.     "Communication," "communicate" or equivalent language means any oral or written communication in the form of facts, ideas, inquiries or otherwise including, without limitation, face-to-face conversations or meetings, telephone conversations, correspondence, voice mail, e-mail, minutes of meetings (including confidential meetings), reports, notes, memoranda, transmittals of documents and the review, by any person, of documents within the possession, custody or control of another person.  The terms also include information relating to

oral communications and written communications whether or not any such information or writings were themselves transmitted by their author to any other persons.

5.     A document or writing or other communication "relates" to or "concerns" or is "regarding" a particular fact, matter or event when it proves or disproves, or tends to prove or disprove, that fact, matter, or event, or contains information concerning, explaining, relating, discussing, pertaining or providing a background for understanding that fact, matter or event, or is evidence of or a result of that fact, matter or event, or could lead to additional relevant information concerning, explaining, relating, or providing a background for understanding the fact, matter or event, or was produced, altered or signed as a part of or as a result of that fact, matter or event.

6.     "Calyon" means Calyon Crédit Agricole CIB and/or its present and former officers, executives, partners, directors, trustees, employees, agents, representatives, attorneys, accountants, parent corporations, holding companies, subsidiaries, affiliates, divisions, departments, predecessors and/or successors-in-interest, and all other persons acting or purporting to act on behalf of Calyon Crédit Agricole CIB.

7.     "You," "Your" or "Magnetar" means Magnetar Capital, LLC and/or and its present and former officers, executives, partners, members, directors, trustees, employees, agents, representatives, attorneys, accountants, parent corporations, holding companies, subsidiaries, affiliates, divisions, departments, predecessors and/or successors-in-interest, any investment funds managed or advised by Magnetar Capital, LLC, and all other persons acting or purporting to act on behalf of Magnetar Capital, LLC.

8.     "Collateralized Debt Obligation" or "CDO" refers to a type of structured finance vehicle under which classes of notes, also known as tranches, are sold to investors, who may then resell them in the secondary market. Those notes are issued pursuant to the terms of an indenture. The proceeds from the sale of the notes (and other securities) are used to purchase a portfolio of investments. Cash flows generated by that portfolio serve as security for, and are

used to repay, the notes. The portfolio is managed by a collateral manager in accordance with the CDO's governing documents.

9. "Orion-1" refers to the Collateralized Debt Obligation for which Orion 2006-1, Ltd. acted as issuer.

10. "Orion-2" refers to the Collateralized Debt Obligation for which Orion 2006-2 CDO Ltd. acted as issuer.

11. "Nationally Recognized Statistical Rating Organization" or ("NRSRO") refers to any entity designated as a Nationally Recognized Statistical Rating Organization by the United States Securities and Exchange Commission.

12. The topics listed herein seek information pertaining to the period from January 1, 2006 through June 30, 2007.

## TOPICS OF DEPOSITION TESTIMONY

A. Your knowledge and communications concerning the structuring and/or creation of the Orion-1 and Orion-2 CDOs.

B. Your purchase of any notes or other securities issued by Orion-1 or Orion-2.

C. Your knowledge and communications related to Orion-1 or Orion-2, including but not limited to all communications You had with Calyon related to Orion-1 or Orion-2.

D. Your knowledge and communications concerning the structuring and/or creation of any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

E. Your purchase of any notes or other securities issued in connection with any CDO for which Calyon acted as the arranger, placing agent or underwriter.

F. Your knowledge and communications related to any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

G. Your knowledge and communications regarding any CDO that Calyon proposed to You as a possible investment.

H.    Your knowledge and communications regarding any CDO transaction that You proposed that Calyon participate in as arranger, placing agent or underwriter.

I.    Your knowledge regarding, and communications with, any collateral manager for any CDO in which You invested for which Calyon acted as the arranger, placing agent or underwriter.

J.    Your knowledge and communications concerning the purchase or management of any assets underlying any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

K.    Your knowledge and communications concerning the fees paid or received by or among Magnetar, Calyon and/or the collateral manager for any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

L.    Your knowledge and communications concerning the profit or loss for Magnetar, Calyon and/or the collateral manager (or the estimation or collection of same) for any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

M.    Your knowledge and communications concerning the valuation of any assets underlying any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

N.    Your knowledge and communications concerning the valuation. expected losses or NRSRO credit ratings of any notes of any CDO in which You invested and for which Calyon acted as the arranger. placing agent or underwriter.

O.    Your knowledge and communications concerning the anticipated or actual credit ratings assigned by any NRSRO for any notes issues by a CDO for which Calyon acted as the arranger, placing agent or underwriter.

P.    Your knowledge and communications concerning the subordination of any notes issued in connection with any CDO in which You invested and for which Calyon acted as the arranger, placing agent or underwriter.

Q.     Your knowledge and communications concerning any short sale, correlation trade, credit default swap or other derivative transaction You executed, or requested be executed, with respect to any investment You made in any CDO for which Calyon acted as the arranger, placing agent or underwriter.

R.     Your knowledge and communications concerning any short sale, correlation trade, credit default swap or other derivative transaction that was executed with respect to any CDO for which Calyon acted as the arranger, placing agent or underwriter.

S.     Your knowledge and communications concerning the performance of the underlying assets for any CDO for which Calyon acted as the arranger, placing agent or underwriter.

T.     Your knowledge and communications concerning the performance of any notes for any CDO for which Calyon acted as the arranger, placing agent or underwriter.

U.     All documents produced by You in response to this Subpoena and your efforts to search for responsive documents.

V.     Your document retention policies.

IT'S YOUR SERVE, INC.
CLIENT ADVANCED FEE ACCOUNT
134 N. LASALLE ST., SUITE 750
CHICAGO, IL 60602

4151

2-1-710

DATE 12/23/09

PAY TO THE ORDER OF _Magnstar Capital, LLC_   $53

_Fifty Three 13/100_   DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
Chicago, Illinois 60670
www.Chase.com

FOR _W+mFee_

⑈004151⑈ ⑆071000013⑆ 652245929⑈

# EXHIBIT B

# WINSTON & STRAWN LLP

214 NORTH TRYON STREET
CHARLOTTE, NORTH CAROLINA 28202-1078

43 RUE DU RHÔNE
1204 GENEVA, SWITZERLAND

15 QUEEN'S ROAD CENTRAL
HONG KONG

99 GRESHAM STREET
LONDON EC2V 7NG

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

4 STASOVOY ULITSA
119071 MOSCOW, RUSSIAN FEDERATION

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

(312) 558-5600

FACSIMILE (312) 558-5700

www.winston.com

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

ONE RIVERFRONT PLAZA
NEWARK, NEW JERSEY 07102-5401

25, AVENUE MARCEAU
CS 31621
75773 PARIS CEDEX 16

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

1700 K STREET, N.W.
WASHINGTON, D.C. 20006-3817

THOMAS L. KIRSCH II
(312) 558-3220
tkirsch@winston.com

January 6, 2010

## VIA ELECTRONIC MAIL AND FEDERAL EXPRESS

Mr. John Haarlow, Jr.
Novack & Macey LLP
100 North Riverside Plaza
Chicago, Illinois 60606-1501

Re:   Subpoena in a Civil Case, In re: Application of IKB DEUTSCHE
INDUSTRIEBANK AG for an Order to Conduct Discovery for Use in a
Foreign Legal Proceeding Pursuant to 28 U.S.C. § 1782

Dear Mr. Haarlow:

I am writing on behalf of Magnetar Capital LLC ("Magnetar") in response to your Subpoena for documents and testimony dated December 23, 2009. Pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), I am tendering these non-exclusive, general objections to your Subpoena. We request that you withdraw your overly broad, untimely, and extremely burdensome third-party Subpoena prior to January 15, 2010. Should you fail to do so, we will follow-up this letter with a timely motion to quash stating these and additional reasons as support for such motion.

As an initial matter, it is impossible to overstate the extreme breadth of your Subpoena. You have noticed an astonishing twenty two topics for deposition and have made eighteen separate document production requests, many of which nearly certainly have nothing to do with the underlying litigation, which appears to be of a contractual nature that has nothing whatsoever to do with Magnetar. Moreover, your requests themselves are extremely broad and fail to meet the particularity requirement.

**WINSTON & STRAWN** LLP

Mr. John Haarlow, Jr.
January 6, 2010
Page 2

We do not believe that you will be able to carry your burden of persuading the Court in a contested hearing that the information you seek is relevant to the litigation. To cite just one example, you request documents concerning the profit or loss for Magnetar in any CDO in which Calyon participated. Such documents have absolutely no relevance to your litigation against Calyon. Furthermore, nowhere in your filings do you indicate why the information you seek cannot be obtained from your opponent but must come instead at considerable expense from a third-party not involved in the litigation that is pending on another continent. Indeed, it appears from even a quick reading of your memorandum in support of your motion that the information you are seeking – Calyon's market ambitions, its assessment of the assets acquired in connection with the CDOs it arranged and marketed to IKB, and its practices in structuring and marketing those deals – will be entirely obtainable from Calyon alone. There appears to be no good reason for your third-party Subpoena to Magnetar.

As you know, your representations to the Court that the Subpoena is somehow limited because it only requests documents from an eighteen month time period is entirely misleading. You have completely failed to disclose to the Court the tremendous complexity and scope of even a single transaction in this market. Additionally, your representation to the Court is almost meaningless because this time period represents the majority of the time during which Magnetar made investments of this type.

Your Subpoena is also grossly premature. From your filings, it is evident that your Defence to Calyon's claims was filed just over a month ago, on or about November 30, 2009. It is our understanding that, and as you are likely aware, the High Court has scheduled a case management conference for February 26, 2010. We are aware of no other scheduling orders, including for discovery under Part 31, in the matter pending before that court. Furthermore, your filings are completely silent on whether Calyon has made any discovery disclosures to date. Should the Court have been made aware that your overly broad Subpoena sought voluminous documents and testimonial evidence to be tendered prior to any disclosures by Calyon, or the High Court even setting a discovery schedule in the underlying case, the Court may well have exercised its discretion and denied your ex parte application.

You also failed to mention to the Court that depositions, such as the one you seek from Magnetar, are impermissible in the English courts. As such, your Subpoena seeks discovery that is apparently not for use in the English proceeding or, combined with the timing of your Subpoena, is a blatant attempt to circumvent the proof-gathering limits and policies of the English courts.

Not only is the Subpoena unduly burdensome and intrusive and an attempt to circumvent English rules of discovery, but compliance with your incredibly broad subpoena would of course result in significant expense to Magnetar. As you know, Federal Rule of Civil Procedure 45(c)(2)(B)(ii) requires the Court to protect a third-party such as Magnetar from such expense. Your ex parte filings in this matter are entirely silent as to the applicability of this non-discretionary Rule here. Should you fail to withdraw your Subpoena by January 15, 2010,

WINSTON & STRAWN LLP

Mr. John Haarlow, Jr.
January 6, 2010
Page 3

Magnetar will seek attorneys' fees, in addition to the cost of production, from your client pursuant to this Rule and any other applicable rule or law.

Very truly yours,

Thomas L. Kirsch

cc:   Paul A. Smith
      Robert Y. Sperling
      Ronald S. Betman

# EXHIBIT C



**Lowenstein Sandler**
ATTORNEYS AT LAW

Steven M. Hecht
Member of the Firm
Tel  973 597 2380
Fax 973 597 2381
shecht@lowenstein.com

January 8, 2010

**VIA E-MAIL AND FIRST-CLASS MAIL**

Thomas L. Kirsch, Esq.
WINSTON & STRAWN, LLP
35 West Wacker Drive
Chicago, Illinois  60601-9703

Re:    *In re: Application of IKB Deutsche Industriebank AG*
       No.: 09-cv-07852 (JWD)

Dear Mr. Kirsch:

We represent IKB Deutsche Industriebank AG ("IKB") in connection with the above-referenced matter.  Our co-counsel, Mr. Haarlow, forwarded to us your January 6, 2010 letter objecting to the subpoena ("Subpoena") that IKB issued and served on Magnetar Capital, LLC ("Magnetar") pursuant to the Court's December 22, 2009 order, to which we now respond.

As a threshold matter, we are surprised – and quite unmoved – by the vitriolic tone and outlandish threats contained in your letter.  We cannot fathom how such a communication could possibly have been intended to serve as a constructive step toward resolving our apparent differences over the matter at hand.  In any event, we will do both sides the favor of not responding in kind, and we look forward to more civil discourse as this matter moves forward.

As to the content of your letter, IKB does not agree that the Subpoena is overbroad, untimely or burdensome and will not withdraw it.  We will not engage in a point-by-point refutation of the various erroneous claims in your letter, other than to note as follows:  IKB may indeed obtain the documents and testimony it seeks irrespective of the current procedural posture of IKB's English litigation with Calyon.  Moreover, IKB may pursue the contemplated testimony wholly independent of the question of whether depositions are available in the English courts.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259-60 (2004) (holding that 28 U.S.C. § 1782 discovery is available prior to commencement of foreign proceeding and that statute contains no foreign discoverability requirement).

IKB is amenable to making reasonable accommodations with respect to the Subpoena.  But Magnetar must first make a more detailed, constructive proposal as to what it does, and does not, find objectionable or overly burdensome.  Simply pounding the table and demanding the outright withdrawal of the Subpoena is a non-starter.  Nor will we be intimidated by baseless threats for sanctions.  If a more reasonable approach is more easily achieved over the telephone than in

Thomas L. Kirsch, Esq.                                          January 8, 2010
Page 2

writing, then just pick up the phone and call me (but without any threats; that will be just as
unproductive in a phone call as in your letter).

We look forward to your next response.

Very truly yours,

Steven M. Hecht

cc:     Monte Mann, Esq. (via e-mail)
        John B. Haarlow, Esq. (via e-mail)
        Zachary D. Rosenbaum, Esq.
        Thomas E. Redburn, Esq.
        Scott L. Walker, Esq.

14866/72
01/08/2010 13533192.2



# EXHIBIT D



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In re: Application of IKB DEUTSCHE )
INDUSTRIEBANK AG for an Order to )
Conduct Discovery for Use in a Foreign )  No. 09-7852
Legal Proceeding Pursuant to 28 U.S.C. )
§ 1782 )  Honorable John W. Darrah

## DECLARATION OF JAMES DANVERS BAILLIEU

1. I, James Danvers Baillieu, am over 21 years old and have personal knowledge of the matters contained in this Declaration.

2. I am a solicitor of the Senior Courts of England and Wales and an associate of Winston & Strawn London, which is the UK arm of Winston & Strawn LLP. I have been asked to make this declaration in support of Magnetar Capital LLC's ("Magnetar") motion to vacate the ex parte 28 U.S.C. § 1782 application granted in favour of IKB Deutsche Industriebank AG ("IKB") and to quash the related subpoena which issued shortly thereafter. Apart from various documents supplied to me for the purposes of making this statement, including IKB's ex parte Application filed in the U.S. District Court pursuant to 28 U.S.C. § 1782 and the documents attached thereto, I do not have any other knowledge of the underlying dispute and apart from making this statement I am not currently involved in my firm's representation of Magnetar.

3. Under English law, the rules governing the disclosure of documents in litigation are set out in the Civil Procedure Rules (CPR) that are made pursuant to statute and are interpreted and augmented by case law. The CPR contains detailed provisions for the disclosure (*i.e.* discovery) of documents both before and during proceedings.

4. In general, disclosure may be sought against third parties, which are subject to its jurisdiction, by the English court pursuant to the jurisdiction conferred by CPR rule 31.17 (and section 34 of the Senior Courts Act 1981). This rule contains two threshold conditions:

  a. the documents sought must be likely to support the case of the applicant or adversely affect the case of one of the other parties; and
  b. disclosure is necessary in order to dispose of the claim fairly or to save costs.[1]

5. Pursuant to Rule 31.17, the disclosure order must be necessary. Where there is duplication of documents already disclosed or where the documents could be obtained from another

---

[1] CPR 31.17(3)(a) and (b)

party to the litigation or by any other convenient means, this threshold condition would likely not be satisfied.[2]

6.  Once the threshold conditions have been met, the court has a residual discretion to determine whether or not the documents sought should in fact be provided.  The Court of Appeal has noted that orders for disclosure from third parties should be the exception rather than the rule.  Even when the threshold conditions are satisfied, the judge would generally consider the degree to which the order is required to dispose of the claim fairly or to save costs.[3]

7.  In the exercise of discretion under CPR 31.17, an English court will generally look to a number of factors, including whether there is an alternative route to obtaining the documents or information contained therein, whether or not the order would be oppressive on the third party, whether the order should be made at a later stage in the proceedings, the degree of likely relevance of the documents, and issues of third party and fourth party confidentiality or privacy.  The court is unlikely to order disclosure pursuant to CPR rule 31.17 where:

    a.  the information contained in the documents could be obtained from an alternative source, in particular from another party in the litigation,[4] or
    b.  the documents are not specifically identified and the third party is unable to comply "mechanistically", *i.e.* without exercising any judgment in selecting the documents to be disclosed.[5]

8.  Unless there is an agreement between the parties to the UK litigation to the contrary, the English court is very likely to order that they give, at a minimum, "standard disclosure". Under CPR 31.6, standard disclosure consists of each party disclosing (a) the documents on which he relies; and (b) the documents which (i) adversely affect his own case; (ii) adversely affect another party's case; or (iii) support another party's case; and (c) the documents which he is required to disclose by a relevant practice direction.

9.  In High Court litigation, standard disclosure is usually ordered following the Case Management Conference.  I understand from the High Court that a Case Management Conference has been scheduled for February 26, 2010 in the UK Litigation.  In addition (or instead of) ordering standard disclosure, the court may order "specific disclosure" under CPR rule 31.12.  This allows a party to apply at any stage, before or after standard disclosure, for an order against the other party for relevant documents.

---

[2] *Flood v Times Newspapers Limited* [2009] EWHC 411 (QB), per Eady, J. at paragraph 12
[3] *Frankson and others v Home Office* [2003] EWCA Civ 655, per Scott Baker LJ at [10]
[4] *Id.,* at [12]
[5] *Re Howglen Limited* [2001] 1 All ER 376, 382-383; *Three Rivers District Council v Bank of England (No 4)* [2002] EWCA Civ 1182; [2003] 1 WLR 210, para. 29.

2

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed On: _15 January 2010_                    
_____

                                              JAMES DANVERS BAILLIEU

Subscribed and Sworn to before
me this 15 day of January, 2010.

_E. Wilkinson_
NOTARY PUBLIC

                              NOTARY PUBLIC
                              LONDON, ENGLAND
                              EMMA WILKINSON
                              (My Commission expires with Life)



                              CHEESWRIGHTS
                              NOTARIES PUBLIC
                              Bankside House, 107 Leadenhall Street,
                              London EC3A 4AF
                              Telephone: 020 7623 9477
                              Facsimile: 020 7623 5428

3

# EXHIBIT E

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: Application of IKB DEUTSCHE | ) | |
| INDUSTRIEBANK AG for an Order to | ) | |
| Conduct Discovery for Use in a Foreign | ) | No. 09-7852 |
| Legal Proceeding Pursuant to 28 U.S.C. | ) | |
| § 1782 | ) | Honorable John W. Darrah |

### AFFIDAVIT OF RUSSELL DAUGERDAS

I, Russell Daugerdas, being duly sworn upon oath, depose and state under penalty of perjury as provided by 28 U.S.C. § 1746:

1. I am currently employed by Magnetar Capital LLC ("Magnetar") as a Compliance Officer and have held this position since July 2007. I have reviewed the subpoena issued to Magnetar in the above-captioned matter in order make this affidavit.

2. In my capacity as Compliance Officer, I am familiar with Magnetar's storage and retention of electronic documents. Magnetar personnel store electronic documents in two different types of locations: Network Based File Servers and Local Hard Disks (which would include both desktop and laptop computer hard drives).

3. Magnetar's network file servers house Magnetar's directories of electronic documents. My understanding is that there is an estimated total of over 100 terabytes (TB) of data stored on Magnetar's file servers. A terabyte is equal to 1,000 gigabytes and 1,000,000 megabytes.

4. Magnetar personnel are provided with multiple directories where they may store files. Collectively, Magnetar personnel maintain over 300 such directories with many hundreds of subdirectories.

5. Backups of the file servers are performed incrementally on a regular basis. A full backup is performed over each weekend.
   a. Incremental backups are stored onsite for one month.
   b. Full backups are archived offsite on a monthly basis, with one backup for each month.

6.  In order to review the data stored on a backup, the backup must be restored in its entirety. Due to the amount of space required for a full restoration, only one full backup can be restored and analyzed at a given time. Magnetar would need to purchase additional storage in order to facilitate a restoration of this type.

7.  The scope of production called for in IKB's subpoena could very likely require exorbitant expenditure of human resources and the purchase of additional tape drives, libraries, and other mechanisms to ensure that Magnetar's ordinary business processes, including its normal backup operations, are not unduly interfered with or interrupted.

8.  If documents that are not electronically searchable are identified (for instance, scanned non-OCR PDF documents), those documents will need to be manually reviewed for responsiveness and privilege.

9.  It is estimated that a production of the type called for by IKB's subpoena would cost Magnetar a minimum of hundreds of thousands of dollars. This estimate does not include professional fees and costs of production.

10. In addition to the Network Based File Servers described above, Magnetar has hundreds of local hard drives, millions of emails, and thousands of physical documents, as well as other forms of media. These are not stored in any single location, but rather are stored in multiple offices and in offsite storage facilities all over the world.

11. The eighteen month time period specified in the subpoena represents the majority of the time during which Magnetar made the type of investments that the subpoena describes.

RUSSELL BAUGERDAS

Subscribed and Sworn to before
me this 15th day of January, 2010.

NOTARY PUBLIC

OFFICIAL SEAL
MARTHA T. MCDONALD
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES JUL. 23, 2012

2